In the matter of Heilbonn.

SUPREME COURT. At Chambers. Before *Mitchell*, Justice
New York, December, 28, 1853.

In the matter of ALEX. HEILBONN, claimed by the British government under the treaty of 1842, as a fugitive from justice, on a charge of forgery.

The power to issue warrants for the purpose of apprehending fugitives from justice, under the tenth article of the treaty between the United States and Great Britain, concluded on the ninth day of August 1842, and under other treaties between this government and foreign governments is conferred by the act of congress of August 12, 1848, ch. 167, as well upon the judges of the several state courts, as upon the justices of the Supreme Court and the several District Courts of the United States and the commissioners appointed by the courts of the United States.

Such warrant can only be issued upon complaint made under oath or affirmation, charging some person with having committed one of the crimes enumerated and provided for in the treaty, and if the complaint be insufficient there is no jurisdiction to issue the warrant.

Where the charge of the crime is made in the complaint in general terms, and the complaint also contains all the facts on which the charge is made, and from such facts it clearly appears that no such crime has been committed, but some other offence not provided for in the treaty, the complaint itself disproves the general charge and takes away the foundation for the warrant.

Where a person had been arrested as a fugitive from justice under a warrant issued by a commissioner appointed by a court of the United States and was

In the matter of Heilbonn.

afterwards brought before a justice of the Supreme Court of this state on *habeas corpus* for the purpose of inquiring into the cause of his detention with a view to obtaining his discharge, held that it was proper for the justice to look behind the warrant for the purpose of ascertaining whether the complaint made was sufficient to give the commissioner jurisdiction.

The proper mode of reviewing a decision of a state judge, made in such case, is by carrying it to the Supreme Court of the state, and from thence to the Court of Appeals, and from thence to the Supreme Court of the United States, if the decision of the Court of Appeals be against the power claimed under the United States law.

Where a bill was drawn by the Bank of Ireland on the Bank of England, on the 2d July 1853, to the order of Mrs. A. Haliday, for £43, 7s. 6d. sterling, and after several intermediate endorsements, was endorsed to Chas. Macintosh & Co., to order, and the bill came to Macintosh & Co by letter, which was sureptitiously taken possession of by Alex. Heilbonn, the prisoner, a clerk for Macintosh & Co., who wrote the following endorsement on the bill,—" Received for Chas. Macintosh & Co , Alex. Heilbonn, No. 9 Vine Street, Regent Street No. 73, Aldermanbury," on which the bill was paid to the prisoner, *held*, that such endorsement did not amount to the crime of forgery, though it appeared that Heilbonn had no authority to endorse bills of exchange or to receive the amount thereof, and that the words " Cnas. Macintosh & Co." were an imitation of the hand writing of a member of the firm, the rest of the endorsement being in the undisguised handwriting of said Heilbonn. And *held* that the offence of the prisoner belonged to a different class of crimes and was not one of those provided for in the treaty between this country and Great Britain.

This was an application on *habeas corpus*, for the discharge of Alex. Heilbonn from arrest, under a warrant issued against him as a fugitive from justice, by U. S. Commissioner Nelson, under the treaty between the government of the United States and Great Britain, on a charge of forgery.

The facts of the case are stated in the opinion of the judge.

*Mr. Busteed*, for the prisoner, made the following points:

1. That the extradition treaty between this country and Great Britain executes itself, and that the act of congress of. 1848 was passed only in aid of such treaties as do not, *ex vi termini*, execute themselves, or provide for their own execution.

2. That the act of congress of 1848, providing a less measure, and establishing a different rule of evidence from that provided for by the treaty and the constitution, is void and unconstitutional.

3. That the prisoner having been found within the territorial limits of the state of New York, only such evidence as by the laws of this state would be admissible before a state magistrate, possessing criminal jurisdiction, can be admitted on the hearing before the commissioner; and that it is the statutory and common law right of the prisoner to be confronted by his accuser and the witnesses against him, so as to have them cross-examined on his behalf.

4. That there is no legal evidence that Muggeridge, (the London alderman,) is a justice of the peace or other magistrate — and no evidence as to what crimes the jurisdiction of justices of the peace for the borough of London extends.

5. That there is no evidence or attestation that the papers offered in proof of the criminality of the accused are true copies of the original depositions upon which the original warrant was issued.

6. That the " complaint under oath," required by the tenth article of the treaty and the first section of the act of congress of 1848, is necessary to initiate jurisdiction in the officer issuing the warrant here; and that no complaint was made in this case.

7. That the facts alleged against the prisoner do not, if proven, constitute the crime of forgery.

*Chs. O'Conor*, (U. S. Dist. Att'y,) for the government.

Mitchell, J., delivered the following opinion:

The prisoner is brought up on a habeas corpus issued by Mr. Nelson as commissioner, appointed by the United States circuit court for this district, under the act of congress for the extradition of fugitives from other countries, pursuant to treaties with those countries, and issued also to the United States marshal for this district. Those officers return, that the prisoner is in the custody of the marshal on a warrant issued by the commissioner, charging the prisoner with having committed in England the crime of forgery, upon the back of a bill of exchange; the warrant orders his arrest, and that he be brought before the commissioner that the evidence of his criminality might be

heard and considered. The prisoner was arrested on the 22d of November, and on the 30th he applied to the commissioner that the examination should take place; the matter was adjourned to the 3d of December, and then he insisted by his counsel that the examination should no longer be delayed. On that occasion it was admitted by the counsel for the prosecution that he would have no further evidence than that on which the warrant issued, except the production of the document alleged to be forged. An adjournment was allowed, notwithstanding the objection of the prisoner; and afterwards this writ was taken out and returned. On the evidence taken on the return, it appears that the only proof on which the warrant issued and on which the further commitment of the prisoner was claimed, consisted of copies of three depositions taken in England, viz.: of George Leigh, Wm. Brockdon and George Bryant; copies of which were produced. Leigh states all the facts of the alleged forgery, Brockdon and Bryant use language which, standing alone, would impute the crime of forgery to the prisoner; Brockdon saying that the endorsement " Chas. Macintosh & Co." appearing on the bill, is a forgery, not written by him or either of his partners nor authorized by them, and he believed it to be the handwriting of the prisoner. But the examination of the two last persons was taken after that of Leigh, and each of them refers to the preceding examination of Leigh as containing a copy of the bill of exchange, and Bryant says also a copy of the endorsement thereon. The facts contained in that examination as to the contents of the bill of exchange and of its endorsement must prevail over those general affidavits, especially as Leigh's examination gives a verbatim copy of the bill and its endorsement. Leigh shows that the bill was drawn on the 2d July, 1853, by the bank of Ireland on the bank of England, in London, to the order of Mrs. A. Haliday, for £43 7s. 6d sterling, that it was endorsed by Mrs. Haliday, without restrictions and not to order — then endorsed by Bukhard & Lohne to A. & L. Camphausen, by the last to L. Kneller, and by him to Chas. Macintosh & Co., to order. Then follows this endorsement, in which the alleged forgery consists:

In the matter of Heilbonn.

Received for Chas. Macintosh & Co., Alex. Heilbonn, No. 9 Vine street, Regent street, No. 73 Aldermanbury.

Leigh says that the endorsement, " Chas. Macintosh & Co.," is an imitation of the handwriting of Mr. Hugh Birley, a partner in the firm, but that it is not his handwriting, or that of any member of the firm; and that the words " received for " and "Alex Heilbonn," are in the undisguised handwriting of the said Alex. Heilbonn. He also says that the bill of exchange came to Macintosh & Co., by letter, and that it and the letter " were surreptitiously taken possession of by the prisoner, and that the prisoner had no authority to write such an endorsement. That after the prisoner fled from England Leigh opened the desk he had used and there found a memorandum in Heilbonn's handwriting, headed " accounts not acounted for," and among the items in that account this bill of exchange was entered as for £42, 7s. 6d. He also states that Heilbonn had been a clerk of Macintosh & Co., for two years, and that his duty was to collect outstanding book debts only, and he had no authority to endorse bills of exchange, or to receive the amounts thereof; and all such securities were paid to the bankers of the firm. The question now presented is whether these facts, if admitted to be true, show that the prisoner committed forgery. Two cases precisely similar in principle have been twice decided in England, and in each it was held that the offence was not forgery. In *Rex* v. *Arscott*, (6 *Carr. & Payne*, 408,) the prisoner had endorsed on a bill of exchange, payable to the order of R. Aickman, these words: — " Received for R. Aickman; G. Arscott." On the trial the court held this was not forgery. Littledale, J., said — " I take it that to forge a receipt for money is writing the name of the person for whom it is received. But in this case the acts done by the prisoner were receiving for another person and signing his own name. Under these circumstances the prisoner must be acquitted upon the indictment." Vaughan, J., said: — " I am of the same opinion and I think it is much better that the most guilty offender should escape than that the law should be strained to meet any particular case. In *Regina* v. *White*, (2 *Carr. and*

*Kirwin*, 404,) the prisoner White wrote on a bill of exchange to the order of T. Tomlinson, this endorsement — per procuration Thomas Tomlinson, " Emanuel White." Pattison, J., apparently to raise the question of law, told the jury that if they were of opinion that the prisoner, at the time when he signed the endorsement, had willfully misrepresented that he came from Tomlinson, with intent to defraud him or the bankers, and had no authority from Tomlinson, they ought to find him guilty. But he reserved the question for the fifteen judges. It was argued fully before them, and they " held the conviction wrong; and that endorsing a bill of exchange under a false assumption of authority to endorse as *per procuration*, is not forgery, that being no false making." It might not be necessary to refer to these authorities, for it is the essence of forgery that one signs the name of another to pass it off as the signature, or counterfeit of that other. This can not be when the party openly, and on the face of the paper, declares that he signs for the other, there he does not counterfeit the name of the other, nor attempt to pass the signature as the signature of that other. The offence belongs to an entirely different class of crimes, and is not one of those provided for in the treaty between this country and Great Britain. That country from which we borrow most of our views of law, and in which the offence was committed, has declared it not to be a forgery. There is no dispute about the facts, and with these two express decisions before us, concurring with the clear meaning of the term forgery, there would appear to be no reasonable doubt about the law — from the facts disclosed in these depositions and which constitute the crime with which the person is charged, he can not, with any propriety, be said to be charged in these depositions with the crime of forgery. It is unnecessary to say how far facts must be stated in the " complaint made under oath," required by our act of congress, nor even to say whether any facts need be stated — but if the charge of a crime is made in general terms, and the complaint also contains all the facts on which that charge is made, and on the admitted facts it clearly appears that no such crime has been committed, the complaint then

In the matter of Heilbonn.

disproves the general charge, and takes away the foundation for the warrant. The oath of an individual, swearing in general terms that a particular crime was committed, can never be received as a foundation for any legal proceeding, when the particular facts which he states disprove the charge — it is not for him, but for the courts to decide what is the character of the offence, when the facts are established. Otherwise, one might be arrested on a charge for forgery, when the complaint shows the offence committed was a literary forgery, or the use of the name of a commander in a military order by an officer engaged in a civil war on the side in opposition to such commander. In this case, too, the prisoner had general authority to collect book debts of the firm, that gave him power to sign the name of the firm to receipts for those debts; and as the limitation of his authority would not be known to the public, and he was engaged, so far as the public could judge, in collecting the prosecutor's debts generally, third persons would be protected in their payments to him. He, too, might even have supposed that he had power to collect this debt, and receipt for it, if the charge of surreptitiously obtaining the bill and letter be disregarded, and it ought, perhaps, to be disregarded, as Leigh states no means of knowledge which he had of the prisoner committing that wrong, and leaves it in doubt whether the prisoner was ever expressly restricted from receipting for bills, or merely had a special authority to collect book debts, from which Leigh inferred that he was restricted from the other power. It is at least extremely doubtful whether forgery can be committed by an endorsement not at all essential to the negotiability of a bill; and it has been held in our Superior Court in a learned opinion, that a draft once endorsed without restriction could not afterward be so undone, in order to make the endorsement of the last endorser necessary. It is a rule in relation to all magistrates acting under a special and limited power, that they have no jurisdiction unless they strictly comply with the power conferred. The power to apprehend fugitives from justice in these cases is conferred by the act of congress of August 12, 1848, ch. 167. It gives the power

to issue the warrant to arrest to any of the justices of the Supreme Court or judges of the several District courts of the United States, and commissioners appointed as the present commissioners have been appointed, and also to the judges of the several state courts, but it is given only " upon complaint," made under oath or affirmation, charging any person with having " committed any of the crimes enumerated or provided for by any such treaty or convention." This shows that without a sufficient complaint on oath, there is no jurisdiction to issue the warrant.

It was argued that on habeas corpus the judge should not go beyond the warrant, and if that were regular he should remand the prisoner. The answer to this is that the commissioner has no power to issue the warrant, and no jurisdiction under the act of congress until a complaint on oath be made before him. Those, therefore, who oppose the discharge of the prisoner in order to show that there is a valid warrant, are bound to show that it was issued on such complaint on oath, and to show this they must produce the complaint. If when produced it shows its original invalidity, it must fall to the ground and the warrant with it. In the case of Metzger, before the present presiding judge of the Supreme Court in this district, and in the case of Haynard before the late Justice Sandford, both of these distinguished justices went behind the warrant and discharged the prisoners. In the case of Metzger, which was under the extraditional treaty with France, Mr. Butler, the United States district attorney, appeared against the prisoner, and among his printed points, while he said that " the validity" of the mandate was the only question then to be decided, he added that in order to its decision it was proper to look into the provisions of the treaty, the orders of Judge Betts, contained in the return, and the evidence presented to and taken before him, ( 1 *Barb. S. C. R.* 251,) and he did not rely on the mandate of the president merely, but on it as fully warranted by " the facts of the case." In his view, it was essential on habeas corpus to go behind even the mandate of the president of the United States, and to see what the facts of the case were, and what the evi-

dence was.  So the learned judge in that case said, " It was his duty to inquire into the cause of the prisoner's detention, and that not merely as it appeared on the warrant by which he was held, but as it might appear from any fact alleged before the judge, to show that the imprisonment or detention was unlawful."   In the case before  Judge  Sandford  he  looked  into  the affidavit on which the warrant of arrest was issued, ( 1 *Sandford's Superior Ct. Rep.* 705), and  found  it  insufficient and discharged the prisoner.   There, too, the affidavit charged the prisoner with felony, but its specifications showed that the real offence was obtaining goods by false pretences, which, as represented to him, was only a misdemeanor in the state where the offence was committed, which he also noticed. (pp. 707, 708.) It is enough here to say, that when the warrant depends for its vitality on a complaint on oath, the judge, on habeas corpus, must examine the complaint on oath, to see if it does clearly complain of such an offence as authorizes the issuing of the warrant.   It was also strongly pressed that on habeas corpus a state judge could not interfere when the arrest purported to be under the laws of the United States or under a treaty.   The cases of Metzger and Haynard were both under the laws of the United States, yet the state judges acted then, and acted reluctantly, but without hesitation, deeming it their duty first to issue the writ, and after they had issued it, not to stop then to make a mockery of justice by refusing to act further, but to go on and hear the prisoner's case and decide it.   In Metzger's case, the prisoner was committed, to be surrendered after examination before a police magistrate, but was discharged by the state judge; he was again arrested and examined before the United States district judge, and a commitment ordered by him, and also by the mandate of the president of the United States; but again he was brought on habeas corpus before the state judge, and by him (after a full argument by the learned counsel, and after a very complete examination into the matter,) finally discharged.   This was in 1847, and congress in the following year adopted the views of the state judge, passed a law to meet the difficulty which he had pointed out; and in that

act, so far from discountenancing the action of state judges in such cases, gave to them the like power to arrest as was given to the United States judges. There is a further reason why justice requires the state judges to act. In the case of Metzger, and in a more recent case, the supreme court of the United States refused to grant a writ of habeas corpus in order to review the decision of the United States district judge, holding that they had no power to review his action at chambers But if the decision of the state judge is erroneous, it can be carried to the Supreme Court of the state, and from thence to the Court of Appeals, and from thence to the Supreme Court of the United States, if the decision of the court of appeals be against the power claimed under the United States law. This is the only entirely peaceable mode of having such questions finally settled, if they are still matters of doubt; and the state courts will freely follow (as is their duty) the decisions of that court of last resort. The revised statutes of our state provide that all proceedings commenced under the article authorizing a habeas corpus before any officer, may be removed by certiorari into the supreme court, to be there examined and corrected; but that no such certiorari shall be issued unless the same be allowed by a justice of the Supreme Court or a circuit judge, nor until a final adjudication shall have been made by such officer, upon the claim to be discharged or bailed. (2 *R. S.* 573, §71, 69.) They then provide for a writ of error to the court for the Correction of Errors, by the prisoner· and by the attorney general in criminal cases, or the party aggrieved in civil cases. There is no limit to the cases in which the appeal may be made by certiorari from the decision of the officer issuing the habeas corpus to the Supreme Court, and if (as suggested) the United States attorney can not carry the case from the Supreme Court to our Court of Appeals, then when the Supreme Court shall decide this case, a final judgment will have been given in a suit in the highest court of law in this state in which a decision in that suit could be had, and there its decision could be reexamined and revised or affirmed in the supreme court of the United States, upon a writ of error, if the· decisions of the state court were against

In the matter of Heibonn.

the right set up under the treaty, or a statute of the United States. (1 *Story's Laws U. S. p.* 61, *Act of* 1789, ch. 22, *sec.* 25.) The state judge, in thus acting, does not in any way interfere with the law of the United States. On the contrary, he conforms to it. He finds an act of congress authorizing an inhabitant of the state to be carried away to a foreign country only when the person is charged on a complaint on oath with some of the offences particularized in a treaty; that inhabitant of the state demands the protection of our laws, and it turns out that the complaint made against him does not show that he has committed any offence for which he can be removed from our territory; thus, those who hold him under the warrant are acting in opposition to the United States laws, and those who discharge the prisoner are acting in support of those laws. The revised statutes have been in operation for more than twenty-three years, and may be considered, so far as they have remained unaltered, as receiving the approbation of successive legislatures. They allow the writ of habeas corpus, and require the judges and courts to issue it except in certain excepted cases. All the excepted cases in favor of the United States are those where process has been issued by any court of the United States, or any judge thereof in cases where such courts or judges have exclusive jurisdiction under the laws of the United States, or have acquired exclusive jurisdiction by the commencement of suits in such courts. (2 *R. S.* 503, § 24, 22.) The authorities before referred to show that this " section" does not apply to a United States judge acting at chambers, or as a commissioner, at least when no actual suit is pending. Besides, the United States judges have no exclusive jurisdiction to arrest in these cases—the same act which gives them power to arrest gives it also to the state judges—and the commissioner who orders the arrest does it as a committing magistrate, and is not a judge of the United States, nor of the United States courts. The power of the state judge to discharge persons held in custody unlawfully by United States officers is exercised probably every week in this city, where persons under age have been enlisted in the United States army without the proper consent.

In the matter of Heilbonn.

In the matter of Ferguson, (9 *J. R.* 289,) the majority of the court seemed to hold it to be a matter of discretion to grant it or not when the court was sitting in term time. This was in 1812. Even then the court would not abandon the right to issue it. In Massachusetts, the power of discharging the soldier was exercised as early as 1815, (11 *Mass. R.* 63, 67,) and it was enforced in our courts in 1847, (7 *Cow.* 471,) the court saying, "Any person illegally detained has a right to be discharged, and it is the duty of this court to restore him to his liberty." Since then there has been no hesitation to exercise the power. If it were unlawful, or even inexpedient, congress would have interfered with the exercise of this power, as it could have done in those cases by making the enlistment of minors valid unless they were discharged by the United States courts. Its silence is an acquiescence in the power of the state courts, and in the propriety of its exercise, even in a case where the powers of the executive are restrained, but restrained only so far as they are exercised against law. The revised statutes also preclude from the benefit of the writ of habeas corpus persons committed or detained by virtue of the final judgment or decree of any competent tribunal of civil or criminal jurisdiction. (2 *R. S.* 568, 24, 22.) By the phraseology used, the judgment or decree binds the party in such case, and he can not go behind it on this writ; but that does not show that he may not go behind the commitment when a magistrate has a limited authority and exceeds it. So a prisoner may not be at liberty to go behind an indictment except for special purposes, but an indictment has an effect *proprio vigore,* and is not, like the warrant in this case, a mere statutory remedy, to be issued by a magistrate only on certain preliminaries being first complied with, and dependent on them for its vitality. The prisoner being unlawfully confined, must be discharged, and an order must be entered accordingly.

Prisoner discharged.